Case No. 341147, April Malick, et al. v. Croswell-Lexington District, et al. Argument not to exceed 15 minutes per side. You may proceed for the appellants. Good morning, Your Honors. Sarah Gordon Thomas on behalf of the plaintiffs' appellants. I'm going to start my argument this morning with the discussion of the deliberate indifference standard. We must show this standard to proceed on both our Title VI claim and our Equal Protection Clause claim. We must show that the school was, quote, clearly unreasonable in light of the known circumstances. I'd like to talk to you a little bit about some of those key known circumstances today that the district court did not address in its opinion. Can I just hit the threshold? I might ask the other side, too. This borrows from the Title IX standard. Correct. Correct, Judge. Is there any reason why we wouldn't follow the Title IX standard or why we automatically should? I think most courts do. Yes, the Title IX standard should be followed here, and I believe that we've shown enough evidence to proceed on our claims with the Title IX standard. It mirrors the legal question. That's the standard you think we should apply? No questions about it? No questions about it. I mean, just about the standard itself, I mean, this is a common standard. We have this standard in some kinds of substantive due process claims where somebody in custody or in some kind of government setting gets hurt. And so in these cases, as I'm sure you know, the defendant does not have vicarious liability for the third parties who are doing the bad stuff. And the question, as it's variously phrased in some of the cases, I mean, like one recent case talks about callous disregard. They have to know about a threat, a risk, some bad thing that's going on, and they callously disregard it. I think another case, maybe it was from the Title IX. Are we in IX or VI in this case? We're in Title VI. Same standard. I think they talk about what the government actor does is effectively a decision not to act.  And no head nodding at the table, please. It's all right. So it's just her turn. So that's a tough standard, you know, and that's what you have to meet here. Anyway, so now you say whatever you want to say. Yes, Judge Ketledge, I agree. It's a tough standard. It's a high burden. I believe we meet it here. And I'd like to focus on a couple of the known circumstances that were aware to the school at the time that the harassment was going on as to our client. Then I'd like to address the suspensions. So the first concept I'd like the court to consider, the harassment here was particularly widespread. This is very important to our case. The district court actually found that we, quote, easily meet the severe and pervasive standard. He said we easily meet severe, pervasive, and objectively offensive. He found that there was a, quote, culture of racism at the school that our client was aware of and that the administration was aware of. He then went on to incorrectly find, this is an inaccurate application of law, that he could not consider all the evidence of widespread harassment that was occurring with regularity throughout the school as to third parties. And he relied on Coleridge for that legal premise. Coleridge does not apply, your honors, to K through 12 cases. And that comes from SC versus Metro Government of Nashville, a 2023 Sixth Circuit case, which held that, quote, the law of the Sixth Circuit ensures Title IX, here, Title VI, liability when a school is deliberately indifferent to a widespread pattern of sexual, here racial, harassment among students. There was absolutely no legal basis for the district judge to exclude the vast evidence of widespread harassment that was occurring throughout the school as to third parties. Now, our client... What do you want him to have done with that information, assuming that you're right in the legal standard? Because he went through each instance where this young woman complained and then addressed what the school district did about that. So if there's a lot of other, as using Judge Kethledge's words, bad stuff going on with others in the school district, what do you want... What is the legal import or impact of that? Yeah. So we have to show that, as Judge Kethledge said, the school made a conscious decision to not remedy the harassment. When you look at the swath of evidence that was occurring throughout the school, the district itself logged 83 incidents of harassment during the relevant time period. And that included rampant use of the N-word, calling black students monkey man, use of the confederate flag. Our client was called a black bitch. Are you going back over the four years, or are you just talking about first year of high school where there were the most incidents? I'm talking about the full four years, Judge. So what I wanted the district court to do or what the court must do under law is the better way to frame it. For just a second.  I have, for better or for worse, I have six kids. And you don't want to spend a lot of time sometimes with middle schoolers or young high schoolers for a lot of reasons we don't have to talk about here. 83 sounds, in the abstract, bad. I agree with that. But 83 divided by four or whatever it is, and then applied over a school district of I think this was 1,000 students or something. We need to keep this in context. Yes, I agree. I hear you. The first thing I want to address as to you don't want to spend a lot of time with middle schoolers. This case, like I said, it easily meets, according to the judge, the district judge, the severe and pervasive standard. So that's the first piece of it. Was Judge Lawson talking about the incidents pertaining to your client or was he talking just generally? I forget. Yeah, so interestingly enough, he did include the incidents that were happening to third parties when he found that we easily meet that standard. Then he erroneously excluded all that important evidence. Well, you go ahead. He excluded all that important evidence when it came to the analysis of deliberate indifference. But that is critical to what the school knew. When you're analyzing whether the school district was deliberately indifferent with respect to the specific harassment of this particular young woman, then back to where I was before, what do we do with all of these other incidents that didn't involve her to assess whether they were deliberately indifferent as to her? Well, so those elements bear on what the school knew and what it failed to do. The school was continuing to take the same steps over and over throughout the course of the four years, even though it knew it had a widespread problem on its hands. And the district court, pursuant to SD versus metro government, had to consider that ample evidence of what was going on as to other students. Our client knew about it and the school administration knew about it. Well, you're coming pretty close to a line that would be set at eliminating discrimination in the school district. And you understand that's not what the test is, right? It's not what the test is. So where do we draw that line, either with respect to what they did do with the people that were harassing this woman, or what they did or didn't do with the rest of the student body? Yes, so they are not obligated to eradicate harassment. That's absolutely correct. But we have to look at what they knew and what they did in response. Here we have these 83 incidents, and I want to quickly address something you said, Judge McKeague. The volume of incidents here actually is comparable to SD versus metro government. We actually have a higher ratio. You keep talking about that. I mean, you keep talking about these generalities. I mean, we have a specific plaintiff who had specific things happen to her and specific actions taken in response to those. You don't seem like you want to talk about those. I feel like that's the gist of the case. I mean, otherwise you're presenting the standard that every student in the school who was a minority could have brought suit because there was a general atmosphere of discrimination in the district. I'm happy to talk about what happened to our client. What are the one or two instances where you think the district was most culpable in its failure to respond? So there was an incident in seventh grade where our client, CM, was shoved and called the N-word by a fellow student. She was given a one-day out-of-school suspension. The student handbook requires something like that be treated as a level C. They treated it as a level A. They didn't follow their policies. They should have given that particular student a lengthier suspension. In addition, our client in ninth grade, this was shortly before she left the district, was told by another student, AG, that she was going to get all these N-words using the actual word and that she wanted to fight our client after school at 3 p.m. She was given a three-day out-of-school suspension. And I want to make a really important point here. The one- to three-day suspensions, that is under the lowest possible level that a school can give. That's called a level A offense. Per the student handbook, they can go up to 10 days. Not once did they go up to 10 days for racial harassment. These are examples where the district did take action. It did things. Now you're saying they should have done more. They could have taken more steps. The idea of deliberate indifference is that they almost did nothing. Are there any instances where you're saying they absolutely ignored it or even furthered it or enhanced it or were just callous to it? Yes. So there are some instances where they didn't address it. But this is a crucial thing. I'm sorry, Judge Riedler, that I'm focusing on to answer your question. Crucial points. When a school knows its practices are, quote, ineffective, it has to do something differently. The standard is not simply they addressed it, they suspended kids, they moved on. First of all, they gave the same low-level suspensions time and time again as this persisted over 83 incidents. I mean, one thing on this point that's kind of interesting, and you can tell me if I'm misunderstanding the record, is that there did seem to be a relatively low level of recidivism, so to speak, of the particular individuals who get suspended. And query whether the school had, I mean, doesn't that suggest to the school that at least it's dealing with those offenders and it's working to that extent? So that's not the law in the Sixth Circuit. I'll point you to Patterson v. Hudson Area Schools addresses that very point. That court describes even if the action taken by the school satisfies the, you know, there's no recidivism with one particular student, if the harassment continues throughout the school, they are still potentially liable for deliberate indifference. That is not enough to just say, well, we checked the box with this student. There were some repeat offenders, and I'll note they were not given commensurate punishment. What you seem to be saying, back to the point we were talking about earlier, is you don't want us to look at whether whatever the discipline that was meted out addressed that particular offender. You want us to address whether the discipline of a particular offender then stopped all of the other harassment that's going on. Is that what you're saying? I am saying that pursuant to Sixth Circuit law, that doesn't carry the day. If one person stops harassing them. I'm trying to figure out, is that what you're saying or isn't it? It's in part what I'm saying, that, yes, they haven't. So what case supports that proposition? So that's Patterson v. Hudson Area Schools. That's a Sixth Circuit case. Thank you. Yeah, they describe that in depth, Judge, and they're very helpful on the point that you're discussing. So I want to touch on a couple things back to the nature of the harassment here and how widespread it was. Well, why don't you take, let's just do like 30 seconds and then you'll get your rebuttal. Okay. So this principle comes not just from this recent SC v. Metro government case. The Sixth Circuit has been describing that widespread harassment as to third parties, third parties, has been considered in this district in the equation of deliberate indifference as early as Davis v. Monroe County. There was third-party harassment in that case. The court considered that in its analysis of whether the school was deliberately indifferent. Third party, you mean another student? Correct. Not to the plaintiff. Yes. Of course. I mean, there has to be evidence that the school officials knew about the other instances. And I thought it was either Judge Lawson or somewhere else that somebody said a lot of this third-party stuff that the plaintiff is citing, there's no indication that it was reported to the school. So that is incorrect. The school itself has a very lengthy record of all of the incidents of harassment that had occurred when our client was attending school. There's no question they knew about roughly 83 incidents of what they considered racial harassment, including use of the N-word, as to other students. There's no question that they knew about that. But I want to make a very, very quick point.  Now we're going to have to let Mr. Chappie have his turn. Okay. All right. You can. Go ahead. Very quickly. If you look to Patterson v. Hudson Area Schools, if you look to Vance v. Spencer County, and if you look to Davis v. Monroe County, this is, on your point, judges, to what the school knew, you see that the plaintiffs, yes, they do report some of the conduct to the administration, certainly. We have to do that to satisfy knowledge. But they are also reporting to teachers, reporting to counselors. Not every single solitary report you see in the case law is connected up to an administrator. It's the big picture. Did the school know of what was going on? Yes or no? Here, absolutely they knew. Okay. You'll have your rebuttal. Okay. Thank you very much. And we'll hear from the school. Sure. Mr. Good morning, Your Honors. Ken Chappie appearing on behalf of the defendant's school district and administrators. To touch on what Ms. Thomas had just mentioned about the deliberate indifference standard and what the school's responses were, the school district in this case, well, let me start with the context, because most of the allegations are condensed to that couple-month period of time in the ninth grade, from about October to December of 2021. And in that timeframe, the school district did not do what they did in Vance and used the same ineffective methods over and over and over again. In Vance, it was just some kind of verbal warning or something? Yes, it was verbal warnings that happened over and over again, and it seemed to incite the students to do it more. Patterson, a case I'm familiar with, that was a case that I was involved in, that stands for a different proposition. That was four years of harassment where the school district actually realized what they could use as a method to work to stop the harassment. It was to provide the student with a particular resource room teacher in the eighth grade. And when they did that, it ended the harassment. And when the school district removed that resource room teacher when the student went into ninth grade, the harassment continued, his protector was gone, and that led to further harassment. That is not what we have here. Our case is more like the Stiles case. In our case, I think that the evidence is pretty clear that once the allegations began in the ninth grade, the school district took significant action to ramp up their discipline and response. It started with the October 4th incident where students were disciplined. Why are you starting in ninth grade? Well, that's the most concentrated area of time. The sixth grade, there was one incident that was reported. I mean, there were incidents throughout middle school. Sure. Look, I mean, you had a hard job, but you have a student who had a lot of incidents while she was in school and ultimately left school at some point. So, okay, I was just wondering why you – there are middle school incidents, too. Yes. It's a long runway. I could start – we'll start with – Not to start with them all. I guess I just – at some point, did the district reassess its approach or take a different approach? I mean, again, this is a broader issue that encompassed more than just one student, and I think it's a very difficult issue, and the standard in some ways is favorable to you because they're trying to take in the realities of the situation. But what did you do to kind of maybe target this student's situation in specific, in particular or more generally, the issues facing the district? So the reason why I was starting in the ninth grade was because that's when the vast majority of the complaints were made from not just the student but the other students that they have referenced. It seems to be condensed into the fall area. And during that time, I can address the middle school. Each of those incidents were investigated. Discipline was handed out with suspensions. The plaintiff's parents were met with. There was cultural competency training provided in August of 2019 to update staff about, you know, what to look out for. So there were more sporadic incidents that were identified in middle school, but the school district responded to everything adequately, and none of those students had repeat offenses against this particular student again. Even the seventh grade incident that Ms. Thomas referred to, that was the very beginning of the school year. It actually started in the summertime outside of the school's control when the particular offending student made a comment on social media that was a racist comment. But there were some that were in the school. Yeah, there were some in the school. My point with that one is that was the one that Ms. Thomas had referenced, and the school district did address that one as well. There was three incidents, I think, identified in the seventh grade. All of them were investigated where students were found to have done something wrong. They were all disciplined. And actually, Mr. Malik, in response to one incident, actually sent the middle school principal an e-mail telling them they did an excellent job in handling the situation. So I believe that everything in middle school, if that was the case, that there's nothing really to talk about there. So I was focusing more on ninth grade because that seems to be where the flashpoint is. And during that period of time— Before you get further into ninth grade, I want to take you back. I think you touched upon this in your earlier argument, but it seems to me that what Ms. Thomas's primary argument is, is based on Patterson. And Patterson says, as I think you know, that just because a school district deals successfully with each identified perpetrator, that the school district can't be liable. Keep in mind, it's a Title IX case, but we're going to assume it applies to Title VI. And the court said there, this argument misses the point. Success with individual students didn't prevent the overall and continuing harassment of the student at issue there. And I think that's basically what her argument is here. Yes, Your Honor. So before we get too hung up on the individual ones, because the school district did do something with respect to almost every one of the individual perpetrators, but that's not the thrust of her argument as I understand it. Correct, Your Honor. And our argument is that the district did escalate the response on an individual basis. They escalated their response to provide proactive preventative measures for the plaintiff to address future harassment, to prevent it. And then they put in place systemic efforts to try to change the overall school environment. And that all occurred in a very short period of time. So starting in ninth grade, that's why I was focusing on ninth grade, because it seemed to be, again, more of the overall environment that they keep referring to. They went from one-day suspensions to, about a month later, increasing it to five-day suspensions for students, not just directing conduct at CM, but to other students as well. They met with the family before she entered ninth grade to see if there was preventative strategies they could use to prevent future harassment, like changing a class schedule with known offenders. And once things happened in school, they changed seating preferences. This is all consistent with styles. But they went beyond that. They provided parapros in the classroom, the two parapros in the classroom. The assistant principal monitored the classroom on one occasion after the October 4th incident to see if there was anything going on. Then there was the overall November, seems to be, where the school district said, we have a problem here that we are realizing. Let's address this. They met with the NAACP president, Kevin Watkins. The superintendent then sent out a letter to the community alerting everyone, we have an issue that's starting to boil over here. We need to address this. Change things at home. Let us know about harassment. Same thing was sent to staff members. There was a public announcement from the board on November 15th saying, we're not going to tolerate this kind of stuff. I don't want you to use up all of your time answering my question. You've now told us a lot of things that they did beyond the individual discipline of a student. Yes, sir. How do we, from your perspective, how do we decide where to draw the line as to whether that overall is enough or not enough? Or alternatively, as Patterson says, say that that's a jury question and it has to go to a jury. Well, I think when you look at a situation like Patterson or Vance, it's when you keep doing the same thing over and over again or you know something is working and remove that measure and you fall back into a pattern of increasing amounts of harassment and you don't do anything different at that point. I think this is the exact opposite case of that. I think this is something where the school district, day by day, continued to try to do something new, even with their trainings for staff, even with the training for teachers, the superintendent making his presence in the school building so that students may be deterred from doing this. I mean, the continued training that was provided went into the next school year when the record ended. The superintendent took it seriously enough that he went on a retreat in August of 2022 to learn more about cultural competency to imply those messages into the school building. I think that they did a lot here. And to answer your question, Judge McKeague, I think that that line ends when you know that the harassment is continuing and is escalating and you do nothing to change it in your response. I just want to ask a factual question about the monitors. I mean, so as I understand it, November 21, the school had, I think, two monitors or how many monitors that would accompany the plaintiff in the hallway? Yes, two monitors, Your Honor. And then one of them, I mean, it's really just like unbelievable what happens that November. And then one of them makes some racist comment or something and so he or she gets fired. Did the other monitor continue to help see him in the hallway or what happened to the monitoring? My understanding, and I'm not sure how clear it is in the record, but my understanding there was an agreement between the family and the administration to remove the monitors altogether. It seemed to draw more attention. All right. Okay. I have two questions. One is a question I asked your friend on the other side, Title IX, Title VI. Is there any reason why we should look at Title VI claims differently? No, they're both spending clause legislation, so I think that both standards should be similar. Okay. Second, there's a state law claim. Yes. And I think the Michigan Supreme Court issued a decision that came out after the district court's decision here that maybe touched on the issue. I should have asked your friend on the other side this too, but what's your position on what we should do with the state law claim, assuming you won on the federal claims? Yes. So I think the same standard should apply. Elliott-Larsen Civil Rights Act doesn't have a specific carve-out statute for a racially hostile environment like it does for sexual hostile environments. There's an actual separate statute that addresses that. So it would be an implied standard or implied cause of action. That's how Michigan courts have generally borrowed from the Elliott-Larsen statute on sexual hostile environments for race hostile environment claims. So it should be a deliberate and different standard there as well. But if you applied the respondeat superior standard that has applied in the past, it's a very similar standard really. It's that the school district or the employer would respond to the complaints that were made, and if they do so in a somewhat arguably adequate manner, then there isn't liability there as well. And I think there was a decision from the Sixth Circuit interpreting that standard in this type of context and said that when you do investigations and address situations, you're setting that. Is there a Sixth Circuit case interpreting the most recent Michigan Supreme Court decision? There is not. So what do we do about it? That was a very helpful answer. I'm not sure. I was really more concerned with what do you think the Michigan Supreme Court decision changed the world in a way that we need to send this back to state court? We should just decide it? We should make our best guess about how we think Michigan courts will treat this kind of claim? Yeah, the Michigan Supreme Court didn't really change the standard. It just applied a standard that already existed that that Sixth Circuit decision had interpreted. So I don't think so. I think this is a standard that can be interpreted by this court. All right. Very well. Thank you very much, Your Honor, for your time. We'll move to rebuttal. As to the Elliott Larson civil rights state claim, we submit to this court that there is enough evidence here to find deliberate indifference. If this court disagrees, we ask that you remand and reverse the district court who exercised supplemental jurisdiction over the Elliott Larson claim so that that claim can go to state court. It's currently pending before the Court of Appeals what standards should be applied to these student-on-student harassment cases. That's a live question before the Michigan courts. So just so I understand what you're saying, if we find hypothetically that there wasn't deliberate indifference under the Title VI standard, you're saying that there is still enough evidence for the Elliott Larson claim to go forward because that's a lower standard in state court? It's a standard that has not been decided by the Michigan courts yet. It was remanded by the Michigan Supreme Court. It's currently pending, Judge, before the Court of Appeals. So we ask this court does not decide what standard is appropriate under Michigan law. We ask that that be reserved for the Michigan courts. On the other hand, if this court finds that there's enough for deliberate indifference, that's the highest standard that the Michigan courts would apply in any case. So we could proceed with our Elliott Larson claim if this court agrees there's enough for deliberate indifference. But we ask that the court not decide on behalf of the Michigan courts. You want us to preserve the Elliott Larson claim in any instance, right? Yes. Yes, Judge. You know, Mr. Chappie went through a number of different things other than suspensions that the school did. And, you know, I mentioned the monitor thing, and they fired the substitute teacher who made a ridiculous remark or some kind of, you know, not helpful. And, you know, you heard what Mr. Chappie said. So, I mean, is this the same thing over and over? You have to kind of demonstrate they're going through the motions, basically. Yes, and I think that there is ample evidence here. I think this is the paradigm of going through the motions, or worse, deciding that, well, we know the problem hasn't stopped with giving students one- to three-day suspensions, but we're going to keep doing that into perpetuity. That is what they did for the vast majority. There was a few minor exceptions where students were given above a three-day suspension. The school knew it wasn't stopping, and they continued to do the same thing. What do you think they should have done? And, you know, maybe education, whatever. But, I mean, like, coercive stuff. If they're going to get tough, what do you think? What's missing here? So that would be up for a jury to decide. However, the school should have followed their policies at the most basic level, which they did not do. They didn't follow the student handbook. There's a form where the school fills out details as to student suspensions. There's a box that's supposed to be checked on that form if the student is found to have engaged in harassment, intimidation, or bullying, which included racial harassment. That box was almost never checked on the form. If the school wanted to send a message to students, you're violating our discrimination policy. And, by the way, that box triggers potential for expulsion under their form. It was almost never checked. It was like they were trying to cover up what was really happening here. They never told students they were violating the discrimination policy. That would have been a basic step. They never really took a serious aim at addressing this in a big-picture way. I mean, they were giving out suspensions. Never school assembly. No student training. So, interestingly enough, I think you didn't say, unless I just missed it, that the suspension should have been longer. Yes, that would have been one. Is that what you are saying? Yes, I'm including that in my category. A lot of the suspensions were three days. So how long should they have suspended? Well, according to the handbook, threats, which happened to our client. A student said, we're going to snatch your weave and burn it. That's a threat. The school acknowledged that. That student could have gotten up to a five-day suspension. And I'm just giving you one example throughout the record. Yes, yes. So generally speaking, some of the one- and three-day suspensions should have been five. Yes. Is that your point? That is absolutely my position. And the school could have gone up to ten days. They could have also gone up to expulsion. And you see in some of the other cases, Vance, Patterson, you do see schools at least trying, let's expel somebody and see what happens here. That never happened here. So that's as to the discipline itself. I want to talk a little bit about the remedial measures. Well, why don't you take one minute and sort of do your summation or whatever you want to do. Okay. I do want to address the remedial measures because this is really, really important. The defendants really overstate what they did here. And we address this in our briefs very specifically. We provide rebuttals as to the deposition transcripts they cited. They very much overstated what they've done as to remedial measures. Would you agree that Judge Lawson really did give you kind of like most favorable? I mean, I frankly thought he did as to some of this evidence. There's evidence she was actually friends with some of these people and it maybe puts it in a different light. But he properly doesn't give any, doesn't look at it in that light. I mean, it seemed like to me he did look at these things the way he's supposed to at least. I disagree that he gave us the light most favorable, Judge Kethledge. He made findings of fact against us where we had submitted ample evidence to the contrary on the record. To address your point about her being friends, she was one of three black kids in a district of 1,900 or so. She, to an extent, had to go along to get along and did try to have a good experience and make some friends. I'm not arguing that point. Sure, sure. So, yeah, fair enough. I'm not being an apologist here. Fair enough. But you can go ahead with what you were going to say. Yeah, I was going to say I don't believe the judge gave us the light most favorable standard. He omitted important facts in his analysis, particularly where our client was called the N-word and shoved. He didn't have any discussion of the N-word used. He made a finding of fact that the school employed a noticeable escalation of its discipline. There was a couple of oddball examples that didn't appear to correlate with the actual offense that were kind of given at random. He found that was a noticeable escalation. This had been going on since sixth grade. The school didn't give out those higher punishments until well into our client's ninth grade year. It was far too late, which does make it a question of fact pursuant to Patterson, whether it's too little too late. All right, well, you know, we've got to keep it fair in the time here. Okay, let me just make one more quick point that the judge ignored. This is really pivotal because you don't see this in any other Sixth Circuit cases where students were bragging and joking about the suspensions they were given for racial harassment. And the school knew about that. That was a clear sign their practices weren't working and they didn't change. All right. All right, thank you. I appreciate it. Thank you both for your arguments. The case was very well briefed and argued. I appreciate it. Thank you. The court is now adjourned.